**In Re: Leland M. BRYSON, Claimant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**William M. Bryson, Jr., Defendant.**

No. 03–1501.

United States Court of Appeals, Fourth Circuit.

Argued: March 17, 2005.

Decided: May 6, 2005.

**ARGUED:** Oscar William Bannister, Jr., Bannister, Wyatt & Kappel, L.L.C., Greenville, South Carolina, for Appellant. Mark C. Moore, Assistant United States Attorney, Office of the United States Attorney, Columbia, South Carolina, for Appellee. **ON BRIEF:** J. Strom Thurmond, Jr., United States Attorney, Beth Drake, Assistant United States Attorney, Columbia, South Carolina, for Appellee.

Before WILLIAMS, MOTZ, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge WILLIAMS and Judge SHEDD joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

After a jury convicted William M. Bryson, Jr., of swindling the estate of an elderly woman, the district court entered a forfeiture order against his assets. William's son, Leland, challenged the order, contending that some of the forfeited assets belonged to him. Finding that Leland had no legal or equitable interest in the forfeited property at the time his father committed the illegal acts that resulted in the forfeiture, the district court rejected Leland's challenge. Leland appeals. In addition to urging affirmance, the Government alternatively asserts that we should dismiss the appeal for lack of jurisdiction because Leland noted his appeal before the district court's judgment became final. For the reasons that follow, we hold that we have jurisdiction and affirm the judgment of the district court.

### I.

### A.

On January 30, 2002, a jury convicted William M. Bryson on two multiple-count indictments. All counts involved a complicated scheme to defraud the estate of Ethel J. Swink. The jury forfeited $800,000 of William's assets.

On June 18, 2002, the district court entered a preliminary order of forfeiture and an order for substitute assets pursuant to 21 U.S.C. § 853(p) (2000). The substitute assets included Lots 16, 17, 18, and 20 at Richardson Pointe in Seneca, South Carolina, and a 54–acre plot on Sitton Mill Road in Seneca, South Carolina. Each of the five lots had been at one time titled in

Leland's name. The court served Leland's attorney with a notice of forfeiture, which Leland acknowledges receiving.

One month later, pursuant to 21 U.S.C. § 853(n), Leland filed a petition of third-party interest in this forfeited property. The Swink Estate, David Lusk, and Rachel Bryson (William Bryson's wife) also filed petitions of third-party interest in other parcels of forfeited property. At the outset of the forfeiture hearing held on January 28, 2003, the Government informed the court that the Swink Estate had only petitioned to protect the forfeiture order, and that the Government had settled with Lusk and reached an arrangement with Rachel Bryson, resolving her claim "by agreement." The court then heard testimony as to the only remaining claim to the property, that of Leland Bryson.

On March 21, 2003, the district court issued an order rejecting Leland's claims and "declin[ing] to amend the final order of forfeiture." The court explained that Leland "failed to establish by a preponderance of the evidence that he has an interest in Lots 16, 17, 18, and 20 of Richardson Pointe, or the fifty-four (54) acre tract on Sitton Mill Road all in Seneca, South Carolina." Although the claims of the Swink Estate, Lusk, and Rachel Bryson seem to have been resolved by the time of or at the forfeiture hearing, the court issued no formal order disposing of those claims; nor did the court certify pursuant to Fed. R.Crim.P. 32.2(c)(3) that it found no just reason for delay with respect to Leland's claim. Nevertheless, on April 14, 2003, Leland filed a notice of appeal.

On September 15, 2003, the Government moved to dismiss Leland's appeal as violative of Fed.R.Crim.P. 32.2(c)(3), which provides:

· If multiple third-party petitions are filed in the same case, an order dismissing or

granting one petition is not appealable until rulings are made on all the petitions, unless the court determines that there is no just reason for delay.

On March 15, 2004, the district court entered orders disposing of the claims of the Swink Estate, Lusk, and Rachel Bryson in the manner outlined at the January 28, 2003 forfeiture hearing. One month later, the Government filed a notice with this court that the district court's March 15, 2004 orders "rendered moot" its motion to dismiss this appeal. Nevertheless, we asked the parties to submit supplemental briefs on the jurisdictional issue. In its brief and at oral argument, the Government changed its position and maintained that we lack jurisdiction to consider the appeal.

### B.

Unquestionably, Leland's notice of appeal was premature. At the time he noted his appeal, the district court had entered a written order rejecting his claims to the forfeited property, but the court had not entered a final order of forfeiture accounting for the other third-party claims to the property, even though those claims essentially had been resolved by then. Nor had the district court made any determination pursuant to Fed. R.Crim.P. 32.2(c)(3) that there was "no just reason for delay[ing]" Leland's appeal prior to the entry of a final order of forfeiture.

In *Equipment Finance Group Inc. v. Traverse Computer Brokers*, 973 F.2d 345 (4th Cir.1992), we considered whether we had jurisdiction over a similar, prematurely filed appeal. There the plaintiff noted its appeal after the district court had granted summary judgment to one defendant, but before it had issued a ruling as to the remaining defendant. Nor, at the time the appeal was noted, had

the court certified, pursuant to Fed. R.Civ.P. 54(b), that the initial decision appealed from was "a final judgment" and there was "no just reason for delay." We concluded that "[n]onetheless ... the subsequent dismissal" of the claims of the remaining defendant prior to our consideration of the appeal "effectively satisfies the finality requirements of Rule 54(b)." *Equipment Finance*, 973 F.2d at 347. We noted that the "practical approach to finality" adopted under these "procedural circumstances" caused no prejudice to the defendant and accorded with the "similar rationale" in *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 532 (4th Cir.1991) (granting effect to Rule 54(b) certification filed *after* appeal noted). *Id.*

As the Government recognizes, the certification specified in Fed.R.Crim.P. 32.2(c)(3), the rule at issue here, "is akin to" that specified in Fed.R.Civ.P. 54(b), the rule at issue in *Equipment Finance*. Supplemental Brief of Appellee at 5 n.3. In fact, Rule 32.2(c)(3) "is derived from Fed. R.Civ.P. 54(b)." Fed.R.Crim.P. 32.2 advisory committee's note; 3 Wright, King & Klein, Federal Practice and Procedure: Criminal 3d § 547, at 451 (2004). Undoubtedly for this reason, the Government implicitly acknowledges that if *Equipment Finance* is good law, its rationale compels the conclusion that we have jurisdiction over the case at hand. The Government suggests, however, that *Equipment Finance* is inconsistent with the Supreme Court's prior decision in *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991).

In *FirsTier*, the Court considered whether an appellate court had jurisdiction over an appeal filed after the district court had orally announced that it intended to grant summary judgment but before the

district court had entered judgment or the parties had, at the court's request, submitted findings of fact and conclusions of law. The Tenth Circuit had held that it lacked jurisdiction over the case because the district court had not issued a final judgment at the time the appeal was noted. *FirsTier*, 498 U.S. at 272, 111 S.Ct. 648. The Supreme Court reversed. *Id.*

The Court pointed out that Fed. R.App. P. 4(a)(2) specifically provided that a notice of appeal "filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof."[1] *Id.* at 272–73, 111 S.Ct. 648. The Court rejected the view that an initial decision or order under Rule 4(a)(2) must be final. Instead, the Court held that the rule permitted an appeal taken from a nonfinal decision, in certain cases, to "serve as an effective notice from a subsequently entered final judgment." *Id.* at 274, 111 S.Ct. 648. The *FirsTier* Court cautioned that, of course, Rule 4(a)(2) does not allow a premature notice of appeal from a "clearly interlocutory decision— such as a discovery ruling or a sanction order under Rule 11 . . .—to serve as a notice of appeal from the final judgment." *Id.* at 276, 111 S.Ct. 648. Rather, the Court held that Rule 4(a)(2) "permits a

notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would be* appealable if immediately followed by entry of judgment." *Id.* (emphasis in original).

Despite the Government's suggestion to the contrary, we do not believe *Equipment Finance* conflicts with *FirsTier*. In *Equipment Finance*, as here, the district court's initial nonfinal decision "would [have] be[en] appealable if immediately followed by entry of judgment," as required by *FirsTier*. In *Equipment Finance* the entry of judgment following the initial nonfinal decision would have to have been done pursuant to Fed.R.Civ.P. 54(b); in the case at hand, it would have had to have been done pursuant to Fed.R.Crim.P. 32.2(c)(3). Obviously, the *FirsTier* Court had no occasion to consider an entry of judgment pursuant to these rules; but nothing in *FirsTier* indicates that its holding does not apply to such judgments.[2] And rightly so: a judgment properly certified by a district court pursuant to Fed. R.Civ.P. 54(b) (or Fed.R.Crim.P. 32.2(c)(3)) is just as final as one made final pursuant to other rules. *See, e.g., Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 351 U.S. 445, 453, 76 S.Ct. 904, 100 L.Ed. 1311 (1956); *Sears, Roebuck & Co. v.*

---

1. Although the language of the rule has changed slightly, it remains the same in substance: "A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." Fed. R.App. P. 4(a)(2) (2005).

2. The Government does not directly address the validity of *Equipment Finance* in light of *FirsTier*. Rather, the Government urges us to adopt the analytical framework of an Eleventh Circuit case predating *FirsTier*. But that case, *Robinson v. Tanner*, 798 F.2d 1378 (11th Cir.1986), is nothing more than a panel's attempt to reconcile several Fifth and Eleventh Circuit precedents, none of which bind us and

many of which seem out of date in the wake of *FirsTier*. Furthermore, the *Robinson* court's disposition of the jurisdictional question before it—whether it had jurisdiction over an appeal (from an order compelling discovery) filed before the underlying suit was dismissed—has no bearing on the case at hand. Like cases holding that *FirsTier* abrogated prior circuit precedent, *see, e.g., United States v. Cooper*, 135 F.3d 960, 963 (5th Cir. 1998), and unlike the case at hand, the premature appeal in *Robinson* involved the kind of plainly interlocutory order that *FirsTier* held could not "serve as a notice of appeal from the final judgment." *See FirsTier*, 498 U.S. at 276, 111 S.Ct. 648.

*Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

Thus, it is hardly surprising that no published opinion adopts the Government's position. Although *Equipment Finance* itself did not discuss *FirsTier,* several of our sister circuits have done so under circumstances similar to the ones before us and found that the confluence of Rule 4(a)(2), as interpreted in *FirsTier,* and Rule 54(b) confers jurisdiction to hear the prematurely filed appeal. For example, in *Barrett v. Atlantic Richfield Co.,* 95 F.3d 375, 379 (5th Cir.1996), the court concluded that "[b]ecause the district court's [initial nonfinal decision disposing of the claims of some, but not all, of the plaintiffs] would have been appealable if followed by Rule 54(b) certification and order, Rule 4(a)(2) permits th[e appellate] court to exercise its jurisdiction." *See also Good v. Ohio Edison Co.,* 104 F.3d 93, 95 (6th Cir.1997); *Clausen v. Sea–3, Inc.,* 21 F.3d 1181, 1185 (1st Cir.1994).[3]

■ As the Tenth Circuit recently explained, albeit without reference to *FirsTier,* a notice of appeal from an order disposing of all claims of one party "filed before the district court disposes of all claims [of all parties] is nevertheless effective if the appellant obtains either certification pursuant to [Rule] 54(b) or final adjudication before the court of appeals considers the case on its merits." *Ruiz v. McDonnell,* 299 F.3d 1173, 1179 (10th Cir.2002). Since in this case the district court's initial decision did dispose of all claims of one party

and the court issued its "final adjudication" disposing of all remaining claims before we "consider[ed] the case on its merits," Leland's premature notice of appeal is "effective." *See id.* Accordingly, we possess jurisdiction and will review Leland's claims on the merits.

## II.

### A.

The district court rejected Leland's claims to a third-party interest in Lots 16, 17, 18, and 20 and the 54–acre plot.[4] Although all of these properties were at one time titled in Leland's name, he did not purchase any of them.

William Bryson bought Lots 16, 17, and 18 and recorded them, respectively, in the names of Leland (then only 17 years old); Leland's mother; and Leland's cousin, Ruth Miller. Leland claims that all three lots were intended for him, although otherwise titled. In December 1995, at his father's direction, all three of them transferred the deeds for Lots 16, 17, and 18 to EJ & WM, Inc., a corporation established by William Bryson of which Leland, although ostensibly president and sole stockholder, testified he knew little. Leland's father received no consideration for the transfer to EJ & WM, Inc.

Leland acquired the 54–acre lot by enforcing a promissory note for $23,000 supposedly evidencing a debt owed to his father by Karl Kenyon, one of his father's co-conspirators. After his father *gave* Le-

3. We note that at least one court has taken the position that *"FirsTier* simply limited the reach of Rule 4(a)(2)'s proviso. It did not hold that the Rule 4(a)(2) situation—announcement of a final decision followed by notice of appeal and then entry of the judgment—is the *only* situation in which a premature notice of appeal will ripen at a later date." *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 587 (3d Cir.1999). Because the case at

hand clearly falls within Rule 4(a)(2), we need not determine whether we agree that there are situations other than those covered by Rule 4(a)(2) when *"*a premature appeal will ripen at a later date." *Id.*

4. At oral argument on appeal, Leland waived any claim to Lot 20, so we shall not further discuss it.

land his interest in the note, Leland sued Kenyon for default. In October 1993, Kenyon "settled" with Leland by transferring to him the deed to the 54–acre lot. In January 1996, at his father's direction, Leland deeded the 54–acre plot to EJ & WM, Inc.

On July 21, 1999, again at his father's direction, Leland, on behalf of EJ & WM, Inc., transferred Lots 16, 17, and 18 and the 54–acre tract into his name. The Government points out that the transfer occurred after Swink's heirs initiated proceedings in probate court to investigate William's dealings with Swink and specifically to question him about EJ & WM, Inc., to which her property had been deeded for no consideration. Brief of Appellee at 24. The transfer also occurred after authorities arrested William's co-conspirator Kenyon. At the forfeiture hearing, Leland testified that he paid property taxes on Lots 16, 17, and 18 and the 54–acre tract for the year 2000.

The district court concluded that "EJ and WM, Inc. was a dummy corporation and the alter ego of William M. Bryson, Jr." The court found that in 1993, when William's illegal activities began, "Leland Bryson did not have legal title" to Lots 17 or 18, nor was he "a bona-fide purchaser after 1993." The court further found that, although Leland had legal title to Lot 16 and the 54–acre tract in 1993, he "did not exercise dominion and control over the property and was, in essence, a 'nominee' of William M. Bryson." The court explained that "[t]here was overwhelming testimony before the grand jury as well as during the trial and the forfeiture hearing that Leland M. Bryson was a pawn in his father's activities" and that whether Leland "was aware of his position" was irrelevant. Accordingly, the court found Leland had "failed to establish by a preponder-

ance of the evidence that the court's final order of forfeiture should be amended."

B.

▮ To obtain an interest in forfeited property, a third party petitioner must prove by the preponderance of the evidence that:

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(n)(6).

Leland concedes that his father "used his relationship with Leland Bryson to help him disguise illegal activities. For example, Bill Bryson placed property in Leland Bryson's name, had Leland Bryson open bank accounts to hide ·or launder Swink money, and set up corporations with Leland Bryson as the sole shareholder and an officer." Brief of Appellant at 8. Nevertheless, Leland steadfastly maintains that the district court clearly erred in rejecting his claims to the forfeited property.

▮ In making this contention, Leland does not argue that he was the bona fide purchaser of Lots 16, 17, or 18. Thus he must demonstrate that he had "a legal interest" in the lots "at the time [they] were] forfeited." *United States v. Schecter*, 251 F.3d 490, 494 (4th Cir.2001) (inter-

nal quotation marks and citation omitted). "Under § 853(c) the interest of the United States in forfeitable property 'vests' 'upon the commission of the act giving rise to the forfeiture.'" *United States v. Reckmeyer*, 836 F.2d 200, 203 (4th Cir.1987). This "relation-back" provision enables "the government to reach forfeitable assets in the hands of third parties at the time of conviction"; it thus prevents "defendants from escaping the impact of forfeiture by transferring assets to third parties." *Id.* Because "[a] forfeiture is effective at the time of the commission of the act giving rise to the forfeiture," *Schecter*, 251 F.3d at 494, Leland must prove that he had a legal interest in the properties in 1993 when his father began to swindle Ethel Swink.

 To prevent "manipulation of ownership" by criminals, we must "look beyond bare legal title" and whether Leland had a "property interest under state law" in determining whether he had a legal interest in the property. *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir.2000). We must ask "whether [Leland] is a nominee—[that is, 'existing in name only, not in reality'"]—when reviewing the substance of his § 853(n) claim. *Id.* at 343 & n. 4 (internal quotation marks and citation omitted). To do so, we employ a dominion and control test. *Id.* at 343.

The district court did not commit clear error in concluding that as of the crucial date—1993—Leland did not have legal title, let alone a § 853 "legal interest," in Lots 17 and 18. His father purchased both lots and titled them in Leland's mother's and cousin's names respectively. Leland alleges that both lots were intended for him and were only deeded to his mother and cousin for purposes of obtaining multiple dock licenses. Even assuming this is so, Leland's father exercised dominion and control over the properties, having bought them, directed those holding title to transfer title to EJ & WM, Inc., and ordered their subsequent transfer (in 1999) to Leland.

Leland did have legal title to Lot 16 and the 54–acre tract in the early 1990s. However, the district court, found that he was merely a nominal owner. If that is so, he cannot prevail on his § 853 claim. *Morgan*, 224 F.3d at 343. The record reveals that William bought Lot 16 and put it in Leland's name; William gave his son the promissory note evidencing a debt owed William, enabling Leland to "settle" the debt for the 54–acre tract. William instructed Leland to transfer both properties to EJ & WM, Inc., William's alter ego, and ordered his son to sign the properties into Leland's name at the time William was under investigation. Leland did not begin paying taxes on either property until 2000—well after his father's fraud commenced. Given this evidence, the district court did not clearly err in finding that Leland acted as his father's nominee and held only nominal title to Lot 16 and the 54–acre tract.

Finally, Leland contends that he was the bona fide purchaser of one property, the 54–acre tract. Even assuming that Leland did not waive this issue by failing to raise it below, that contention also fails. We recognize that "the term 'bona fide purchaser for value' must be construed liberally to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return." *Reckmeyer*, 836 F.2d at 208. Nevertheless, the district court did not clearly err in holding that Leland was not a bona fide purchaser of the 54–acre tract. Leland obtained the tract by enforcing a promissory note that his father *gave* him. Thus, Leland paid no "value" for the 54–acre tract.

Leland asserts that he expended value to obtain the tract by exerting "time, effort, and knowledge" to sue Kenyon. Brief of Appellant at 18. But, Leland has not provided any evidence as to this "time, effort, and knowledge." Furthermore, as the district court found, "[t]here is no evidence in the record indicating the note represents a legitimate debt between Karl Kenyon and William M. Bryson, Jr." Rather, the record indicates that Leland's suit against Kenyon was not truly adversarial but just a sham to collect on a sham debt between the two co-conspirators, William and Kenyon.

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*