**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

                *Plaintiff-Appellant,*

        v.

STATE OF OREGON; STATE OF
WISCONSIN,

                *Petitioners-Appellees,*

        and

STATE OF SOUTH CAROLINA;
STATE OF ARIZONA; STATE OF
ARKANSAS; STATE OF COLORADO;
STATE OF IDAHO; STATE OF MAINE;
STATE OF MARYLAND; STATE OF
MASSACHUSETTS; STATE OF
MISSOURI; STATE OF NEW
HAMPSHIRE; STATE OF OHIO;
STATE OF WASHINGTON; STATE OF
WEST VIRGINIA; STATE OF
TENNESSEE; STATE OF
PENNSYLVANIA; STATE OF
KENTUCKY; STATE OF NORTH
DAKOTA;

No. 10-2154

STATE OF ILLINOIS; STATE OF
GEORGIA; STATE OF NORTH
CAROLINA; COMMONWEALTH OF
PENNSYLVANIA; STATE OF KANSAS;
STATE OF OKLAHOMA; STATE OF
NEW YORK; COMMONWEALTH OF
VIRGINIA; STATE OF MICHIGAN;
STATE OF LOUISIANA; STATE OF
CALIFORNIA,

*Petitioners,*

and

TERENCE PATRICK MCLAUGHLIN;
GEORGE CHEMALI; CLP,
INCORPORATED,

*Defendants.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, District Judge.
(1:09-cr-00004-jpj)

Argued: December 8, 2011

Decided: February 16, 2012

Before DUNCAN, DAVIS, and WYNN, Circuit Judges.

Vacated and remanded by published opinion. Judge Duncan
wrote the opinion, in which Judge Davis and Judge Wynn
joined.

**COUNSEL**

**ARGUED:** Sharon Burnham, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellant. Monica Taylor Monday, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellees. **ON BRIEF:** Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, for Appellant. James J. O'Keeffe, IV, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellee State of Oregon; Christopher J. Blythe, Lewis W. Beilin, WISCONSIN DEPARTMENT OF JUSTICE, Madison, Wisconsin, for Appellee State of Wisconsin.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises from the United States' effort to forfeit the assets of C.L.P., Inc. ("C.L.P.") following its guilty plea to several tobacco-related charges. As relevant here, the United States obtained a preliminary order of forfeiture allowing it to seize funds that C.L.P. had deposited into an escrow account, which held 35 sub-accounts for the benefit of each state in which C.L.P. sold its products. Two of those states, Oregon and Wisconsin (the "States"), sought to amend the forfeiture order to exclude their respective sub-accounts from the forfeiture, an amendment the district court ultimately granted. Because we conclude that the States have not proven by a preponderance of the evidence that they have a legal interest that entitles them to amendment of the forfeiture order, we vacate the forfeiture order and remand.

I.

Because the facts of this case are somewhat complex, we will provide relevant background. First, we discuss how the

concept of the escrow account at issue here evolved. Second, we describe the creation of C.L.P.'s escrow account and the Oregon and Wisconsin sub-accounts. Third, we describe the forfeiture process in criminal prosecutions. Finally, we discuss the forfeiture at issue here.

A.

In November 1998, 46 states, five territories, and the District of Columbia agreed with certain major tobacco product manufacturers to end years of litigation over tobacco-related illnesses by signing a Master Settlement Agreement (the "MSA"). Under the MSA, participating manufacturers agreed to restrict their advertising and marketing practices and pay significant sums to participating states each year in perpetuity.

Not all tobacco product manufacturers are parties to the MSA. Therefore, the MSA provided incentives for participating states to pass statutes (the "escrow statutes") applicable to non-participating manufacturers ("NPMs"). Most states—including Oregon and Wisconsin—passed a model escrow statute. These statutes, inter alia, require NPMs to deposit into an escrow account a specified sum per tobacco unit sold in a state on an annual basis. The deposits approximate what the NPMs would pay had they participated in the MSA.

The purpose of the escrow statutes is twofold. First, they aim to level the economic playing field between the participating manufacturers and NPMs. The requirement that NPMs pay amounts similar to those paid by participating manufacturers eliminates any competitive advantage the NPMs might otherwise have. Second, they ensure that there is a source of funds against which participating states can collect any future judgments or settlements arising from tobacco-related liability against the NPM.

To comply with the escrow statutes, NPMs typically create a master account with a sub-account for each participating

state. The escrow statutes require escrow agreements that limit the NPMs' ability to access those funds. An NPM is generally only allowed to withdraw funds to pay a judgment or settlement or to obtain a refund of any payment in excess of what the NPM would have paid under the MSA. The funds deposited roll out of the account and flow back to the NPM if there are no claims made against the account within a certain period of time after each deposit.

Beyond their distinctive origins, the escrow accounts are unremarkable. The NPM selects a bank to hold the funds as the escrow agent. The NPM and the escrow agent sign an escrow agreement, which mirrors the statute in defining the terms of the account. This agreement specifies the conditions upon which the escrow agent is to pay the funds to the beneficiary of the account.

States participating in the MSA are obligees of these accounts. As such, they have a right to funds from the accounts, but only if they satisfy the escrow conditions. Specifically, they must either win a judgment or settle a case against the NPM and the NPM must elect not to pay the judgment or settlement out of other funds. The states have no right to access the escrow funds before they satisfy the escrow conditions and no say in the quotidian administration of the accounts.

B.

C.L.P. was the manufacturer of Bridgeton cigarettes until it ceased operations sometime before 2010. Like other smaller tobacco companies, it had declined to participate in the MSA and was therefore subject to the escrow statute in each state in which it sold tobacco products. It established its escrow account, with sub-accounts for each participating state, at First Citizens Bank & Trust Company ("First Citizens") in North Carolina. The escrow account contained a sub-account

for each state in which C.L.P. sold tobacco products, includ-
ing Oregon and Wisconsin.

C.L.P. entered into an escrow agreement with First Citizens
as the escrow agent. The terms of the escrow agreement are
those required by escrow statutes generally. For example,
§ 3(d) of the agreement specifies that all deposits "shall be
held, invested and disbursed in accordance with the terms and
conditions of [the escrow agreement] and the [escrow stat-
utes]." J.A. 51. Similarly, the escrow agreement, like the
escrow statutes, carefully circumscribes payments from the
escrow account. Section 3(f)(i) permits the release of funds to
pay a judgment or settlement brought by a participating state.
If the escrow agent receives no objections to a proposed
release of funds, it is to pay out the funds in the order in
which they were deposited and only to the extent needed to
satisfy the judgment or settlement. Section 3(f)(ii) directs the
escrow agent to return funds to C.L.P. if the company estab-
lishes that it paid more than it would have had it participated
in the MSA. Finally, § 3(f)(iii) states that "[t]o the extent not
released from escrow under subsections (i), or (ii), funds shall
be released from escrow and revert back to [C.L.P.] twenty-
five (25) years after the date on which the applicable annual
installments thereof were placed into escrow." J.A. 54. The
escrow agreement specifies that "it shall be construed in
accordance with and governed by the laws of the State of
North Carolina." J.A. 59.

Although C.L.P. cannot access the funds before they roll
out of the account, § 3(e) of the agreement entitles it to "re-
ceive the interest of other appreciation on the funds . . . as
earned," but "such payment shall be subject to the payment of
the Escrow Agent's fees, costs, and expense." J.A. 53. This
provision places the cost of maintaining the account on C.L.P.
Should C.L.P. fail to pay maintenance costs, other provisions
in the escrow agreement restrict the Escrow Agent's ability to
access the funds, thereby ensuring that they remain available
in full for the States.

## C.

We turn now to the process of criminal forfeiture. The details of the forfeiture scheme, as relevant here, are found primarily in 21 U.S.C. § 853 and Federal Rule of Criminal Procedure 32.2. The United States' power to forfeit property arises from 21 U.S.C. § 853, which provides that any person convicted of certain crimes, "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" those crimes. 21 U.S.C. § 853(a). Importantly for our purposes, when the property representing direct proceeds of illegal activity is unavailable, the United States may instead seek the forfeiture of "substitute property" of a defendant up to the value of the property that would otherwise be subject to forfeiture. *Id.* at § 853(p).

Rule 32.2 sets forth the procedure of forfeiture. First, the United States must provide notice to a defendant by including a forfeiture allegation in the indictment or information filed against the defendant. Fed. R. Crim. P. 32.2(a). Next, "after a . . . plea of guilty . . . is accepted, . . . the court must determine what property is subject to forfeiture under the applicable statute." *Id.* at 32.2(b)(1)(A). "If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." *Id.* at 32.2(b)(2).

After the property is seized pursuant to the preliminary forfeiture order, *see id.* at 32.2(b)(3), any third party who claims an interest in the property to be forfeited may file a petition with the district court contesting the forfeiture, *id.* at 32.2(c)(1). The district court considers this petition in what is called an "ancillary proceeding." *Id.* The preliminary order of forfeiture cannot become final until after the ancillary proceeding concludes. *Id.* at 32.2(b)(4)(A). As relevant here, the

district court must first consider any motion by the United States to dismiss the petition for lack of standing before moving to the merits of the petition. *Id.* at 32.2(c)(1)(A), (B). "When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." *Id.* at 32.2(c)(2).

Returning to 21 U.S.C. § 853, subsection (n) provides the standard by which the district court is to evaluate a petition by a third party at an ancillary proceeding. The district court "shall amend the [preliminary] order of forfeiture" if it "determines that the petitioner has established by a preponderance of the evidence that . . . the petitioner has a legal right, title, or interest in the property . . . [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section." 21 U.S.C. § 853(n)(6).[1]

In essence, then, this type of ancillary proceeding consists of four steps. First, a petitioner files a petition asking to be heard. Second, the district court considers any motions to dismiss filed by the United States. Third, if the district court denies those motions, it holds a hearing and determines whether the petitioner has proven by a preponderance of the evidence that its interest was either vested or superior to the defendant's interest at the time the acts giving rise to forfeiture occurred. Finally, if the district court concludes that the petitioner has carried its burden, the district court amends the forfeiture order as needed to account for that interest.[2]

---

[1]Although not relevant here, a petitioner is also entitled to amendment if it can prove by a preponderance of the evidence that it "is a bona fide purchaser for value . . . and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B).

[2]Amendment may not always be necessary. For example, a district court could conclude at step four that the petitioner's interest is already sufficiently accounted for in the forfeiture order and therefore no amendment is needed.

### D.

We now turn to the forfeiture proceedings in the district court. On January 15, 2009, C.L.P. was charged with violations of the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2342(b), evasion of the Federal Cigarette Excise Tax, 26 U.S.C. § 5762(a)(2), and mail fraud, 18 U.S.C. § 1341. The Information filed against C.L.P. included a forfeiture allegation in the amount of $801,495.00. The illegal acts giving rise to the forfeiture were alleged to have occurred throughout the years of 2007 and 2008. The same day the Information was filed, C.L.P. pleaded guilty to the charges and consented to a forfeiture money judgment in the amount of the forfeiture allegation—$801,495.00.

C.L.P. did not possess sufficient funds to cover the money judgment and, accordingly, the district court, in its preliminary order of forfeiture,[3] ordered forfeiture of substitute assets pursuant to 21 U.S.C. § 853(p). The largest of these assets was "[a]ll funds, to include deposits and interest accruals, held by First Citizens Bank & Trust Company as escrow agent for C.L.P. Inc. . . . to include all sub-accounts related thereto, in the approximate balance of not less than $722,135.27." J.A. 30. The United States seized $725,328.70 from the escrow account shortly thereafter.

Many of the states with sub-accounts took the first step in the ancillary proceeding by filing petitions with the district court pursuant to § 853(n). The United States proffered settlements under which each state would immediately receive 80 percent of the funds in its sub-account and the United States would keep 20 percent. Of the 35 states for which C.L.P. had placed funds in the escrow account, six defaulted their claims to the funds, 27 accepted the settlement, and two, Oregon and Wisconsin, refused it.

---

[3]The district court styled its preliminary order of forfeiture a "First Amended Order of Forfeiture." J.A. 29.

At step three[4]—considering the asserted interest—Oregon and Wisconsin did not argue that the escrow conditions had been satisfied at the time C.L.P. committed the acts giving rise to forfeiture—and thus that they had an immediate claim on the funds. Nor did they argue that at that time they were pursuing claims that could have satisfied the condition. The States instead argued that the United States was not entitled to forfeit the principal in their sub-accounts because it could only acquire what C.L.P. had, namely a reversionary interest in the account and any interest generated by the principal. The district court agreed with the States. It held that because forfeiture only allows the United States to step into C.L.P.'s shoes, the United States could at most forfeit C.L.P.'s right to interest from the account and its reversionary interest in the principal. It explained that Oregon and Wisconsin "have the right for up to 25 years to make their tobacco-related claims." J.A. 77. Accordingly, the district court concluded that the States had carried their burden and that the order of forfeiture must protect the States' interest.

At step four, the district court amended the forfeiture to protect the States' interest. The final order of forfeiture describes the States' interest in the escrow funds as "vested in the [States] rather than in the defendant C.L.P., Inc. and . . . superior to any right, title, or interest of C.L.P., Inc." J.A. 80. The order removes the funds in the States' sub-accounts from immediate forfeiture and compels the United States to maintain the sub-accounts in accordance with the escrow agreement.[5]

---

[4]The United States, at step two, filed motions to dismiss for lack of standing Oregon and Wisconsin's petitions. The district court appears to have skipped this step, and moved directly on to step three, determining whether the States had carried their burden.

[5]Under the order, the United States is responsible for maintaining these sub-accounts until all of the funds roll out over the next 25 years. It need not make any future contributions to Oregon and Wisconsin's sub-accounts, but is presumably responsible for the costs associated with maintaining them. As per the order, the United States would gain access to the forfeited funds only as they roll out of the escrow account.

## II.

The United States now appeals the district court's final order excluding funds in the States' sub-accounts from immediate forfeiture. It first argues that the States did not have an interest in the funds and therefore lacked standing to file a petition under § 853(n). In the alternative, it argues that, even if the States have standing, they failed to carry their burden at the ancillary proceeding, and that their interest in the funds is, as a matter of federal law, insufficient to justify the district court's amendment of the forfeiture order. We address each argument in turn.

In an appeal from a criminal forfeiture proceeding, "we review the district court's findings of fact for clear error and the district court's legal interpretations de novo." *United States v. Martin*, 662 F.3d 301, 306 (4th Cir. 2011). Because the facts in this appeal are uncontested, our review is de novo.

## A.

We turn first to standing.[6] Subsection (n)(2) of 21 U.S.C. § 853 allows any person, other than the defendant, asserting a "legal interest" in the property to petition the district court for a hearing to adjudicate its asserted interest. Accordingly, the touchstone for standing is the possession of a legal interest in the forfeited property.

Although the forfeiture issue here is a matter of federal law, we generally refer to state law in determining whether a peti-

---

[6]We note that the "standing" at issue in this case is statutory standing, which is a separate inquiry from Article III standing. *See Thompson v. N. Am. Stainless*, 131 S. Ct. 863, 869-70 (2011). Statutory standing is itself a merits issue. *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (explaining that dismissal for lack of statutory standing is "effectively the same as a dismissal for failure to state a claim" (citations and quotation marks omitted)). We analyze standing at the outset pursuant to Fed. R. Crim. P. 32.2(c)(1)(B).

tioner has a legal interest in forfeited property.[7] Here, the States' interest, if any, was created by the escrow agreement, which, as noted above, is to "be construed in accordance with and governed by the laws of the State of North Carolina." J.A. 59. Accordingly, we will examine North Carolina law to determine whether the States have a legal interest in the forfeited funds.[8]

The general rule under North Carolina law is that the party who deposited the funds into an escrow account retains title to those funds until the escrow condition is satisfied. *Johnson v. Schultz*, 671 S.E.2d 559, 564 (N.C. Ct. App. 2009). Because there is no evidence that the condition on the account—a settlement or judgment against C.L.P.—has been satisfied, we conclude C.L.P. (or the United States qua C.L.P.) has title to the funds in the relevant sub-accounts. The States' interest, then, is something other than legal title.

---

[7]We have occasionally departed from state law in these circumstances where there is evidence a defendant has manipulated state law property rights to shield assets from the reach of the forfeiture law. *See In re Bryson*, 406 F.3d 284, 290-91 (4th Cir. 2005); *United States v. Morgan*, 224 F.3d 339, 342-43 (4th Cir. 2000). *Cf. United States v. Totaro*, 345 F.3d 989, 994 (8th Cir. 2003) (holding that federal courts will look to state law for these purposes only "so long as doing so does not frustrate a federal interest"). Where, as is the case here, there is no evidence of such manipulation, we revert to the norm of reliance on state law. *See United States v. Schecter*, 251 F.3d 490, 494 (4th Cir. 2001); *United States v. Buk*, 314 F. App'x 565, 568 (4th Cir. 2009) (unpublished).

[8]The States appear to argue that their state laws should apply because their legal interest was created by their respective escrow statutes. We disagree. Although it is true that the escrow statutes mandated the creation of the escrow account, it is the escrow agreements that actually created the escrow account and created the States' property interest. Therefore, it is the state law selected in the escrow agreement that determines any beneficiary state's interest in the escrow funds. *Cf.* Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 23-12, at 674 (2007) ("[T]he court looks to the law of the jurisdiction that created the claimant's interest to see what interest the claimant has in the property.") (collecting cases).

The United States insists that we should stop here, asking rhetorically, "If CLP remains the full owner of the funds, what is the 'legal . . . interest in the property' held by the States?" Appellant's Br. 18. Even assuming that, as depositor, C.L.P. "remains the full owner of the funds,"[9] we do not believe that ends our inquiry. For example, a defendant may forfeit to the United States an interest other than legal title in an asset. *See* 21 U.S.C. § 853(b) ("Property subject to criminal forfeiture under this section includes . . . tangible and intangible personal property, including rights, privileges, interests, [and] claims."). Following the reasoning of the United States then, a petitioner with less than legal title challenging the forfeiture in such a circumstance could never have standing, even if its interest is greater than that forfeited by the defendant to the United States. We decline to adopt such reasoning.

Turning back to our examination of North Carolina law, we conclude that an obligee[10] of an escrow account does have a legal interest in the funds contained in that escrow account. In *GE Capital Mortgage Services v. Avent*, 442 S.E.2d 98, 100 (N.C. App. Ct. 1994), for example, the North Carolina Court of Appeals held that when an escrow agent embezzles escrow funds prior to the satisfaction of the escrow condition, the loss lies with the depositor and not with the obligee. Applying that reasoning to this case, had C.L.P.'s escrow agent absconded with the funds in the escrow accounts, the States could have sued to force C.L.P. to replenish the funds. If the States had no interest in the funds, they would have no right to require C.L.P. to replenish the funds. Accordingly, because the States did have such a right under North Carolina law, we conclude that the States, as obligees of an escrow account, must have

---

[9]It is unclear to us what the United States means by the term "full owner." We assume it uses the term here to mean a holder of legal title.

[10]Although the escrow agreement refers to the States as "beneficiaries," in the terms of escrow law, they are "obligees." *See Johnson*, 671 S.E.2d at 565 (quoting 28 Am. Jur. 2d Escrow § 1 (2000)).

had some legal interest in the escrow funds, even prior to the occurrence of the escrow condition. With such an interest, the States have standing to press their claims in an ancillary proceeding under 21 U.S.C. § 853(n).

B.

Having concluded that the States have standing to adjudicate their petitions, we now consider whether the States "established by a preponderance of the evidence that" their legal interest in the escrow funds was "vested in [them] rather than in [C.L.P.] or was superior to any right, title, or interest of [C.L.P.] at the time of the commission of the acts which gave rise to the forfeiture of the property." 21 U.S.C. § 853(n)(6).[11] Although the interests held by the petitioner and the defendant are generally defined by reference to state law, the question of whether a petitioner's interest satisfies the requirements of 21 U.S.C. § 853(n)(6) is a question of federal law. *See United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000); *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996).

It is important at the outset to observe that the issue we are considering at this point is not whether an error occurred at some point in the forfeiture process that requires amendment of the forfeiture order.[12] Instead, we are only at step three—considering whether the States have proven, by a preponderance of the evidence, that they have a legal interest in the escrow funds that entitles them to amendment of the forfeiture order. Only if we conclude that the States have carried their burden will we go on to step four and consider appropri-

---

[11]As this requirement is framed in the disjunctive, a petitioner may satisfy it in two ways: proving that the interest was vested, or proving that the interest was superior. *See United States v. Wilson*, 659 F.3d 947, 953 (9th Cir. 2011).

[12]For example, the issue of whether the United States acquired from the forfeiture something greater than what C.L.P. had to forfeit is not before us. The only question is whether the States' legal interest in the funds as of January 2007 entitles them to amendment of the forfeiture order.

ate amendment of the forfeiture order. *See United States v. McHan*, 345 F.3d 262, 270 (4th Cir. 2003) ("[I]t was Congress' clear intention in passing § 853(n) that third parties have an opportunity to be heard and to be awarded relief *if* they were to show a cognizable interest in the property preliminarily ordered forfeited." (emphasis added)); *see also Libretti v. United States*, 516 U.S. 29, 44 (1995) (reaffirming that a § 853(n) proceeding is the "only . . . means" by which a third party may safeguard his rights in property ordered forfeited under § 853, even where the complaint is that the forfeiture itself was unsupported by factual evidence). We conclude that the States have not carried their burden, and therefore our inquiry ends at step three.

We first consider whether the States' interest in the escrow funds was vested during 2007 and 2008, when C.L.P.'s acts giving rise to the forfeiture were occurring. *Black's Law Dictionary* defines "vested" as: "Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute[;] does not depend on an uncertain period or event." *Black's Law Dictionary* (9th ed. 2009). Thus, for the States' interest in the escrow funds to have been vested, the escrow condition must have been satisfied, i.e., the States must have achieved a judgment against or settlement with C.L.P.; otherwise, their interest, by definition, remained conditional, and thus unvested. The States make no claim that the escrow condition was satisfied by the existence of any such judgment or settlement. Therefore, we must conclude that the States' interest was not vested during 2007 and 2008.

We now consider whether the States' legal interest was superior to C.L.P.'s during 2007 and 2008. As noted above, superiority is a question of federal law. Although "superior" is not defined in the statute, a practice has developed in the courts to treat the inquiry as similar to a quiet title action. *See McHan*, 345 F.3d at 275 ("[T]he relief offered to a complainant in a quiet title action is substantially the same relief

offered to a § 853(n) petitioner."); *see also United States v. Cone*, 627 F.3d 1356, 1359 (11th Cir. 2010) (describing the "section 853(n) ancillary forfeiture proceeding" as "designed to quiet title"). Thus, as in a quiet title action, the inquiry here is not a precise one, but instead involves equitable considerations and is necessarily fact-bound and value-laden. *See Mchan*, 345 F.3d at 275 ("[C]laims for the type of relief offered by a quiet title suit have always been equitable actions, brought in the courts of equity rather than courts of law."); *see also id.* ("The [§ 853(n)] proceeding at bottom becomes a competition over ownership priority with the court determining the superior title."). *Cf. Morgan*, 224 F.3d at 343 (approving of the district court's looking behind the labels of the parties' interests to determine if a petitioner "had a property interest sufficient to prevent forfeiture" under 21 U.S.C. § 853(n)(6)).

We now proceed to resolve the competition over ownership priority by comparing the respective legal interests. We determine that the States do not have a superior interest to the escrow funds. As already noted, under North Carolina law, the United States qua C.L.P., maintained title over those funds during 2007 and 2008 as depositor. Such title, when compared to the States' unvested interest in the escrow funds, places the United States in a strong position.[13] We decline to end our inquiry there, however. We cannot ignore that the funds were placed in the escrow account for a purpose and that that purpose was to benefit the States should they obtain a judgment against, or settle a claim with, C.L.P. Considerations of equity would raise serious concerns were the States to have demonstrated some likelihood that judgments or settlements were in the pipeline.[14] The burden, however, was on the States to demonstrate such a likelihood, and they failed to

---

[13]We also note approvingly that were the status quo of 2007 and 2008 maintained, C.L.P. would ultimately regain possession of the funds, free and clear of any obligation to the States.

[14]In a similar vein, considerations of equity would also give pause, for example, if a teenage beneficiary were challenging the forfeiture of a trust set up by a defendant-parent to pay for the beneficiary's college tuition. That the defendant-parent maintained title over the trust corpus would be only one of many factors a court would consider in determining superiority under 21 U.S.C. § 853(n)(6)(A).

do so. As noted above, the States put forth no evidence that they, at any time, had—or were even considering—claims against C.L.P.

In the absence of such evidence, we return to our initial inclination that the United States is in a stronger position and therefore have no choice but to conclude that the States failed to carry their burden to prove, by a preponderance of the evidence, that their legal interest in the escrow funds was superior to C.L.P's during 2007 and 2008. Accordingly, the States are not entitled to have the forfeiture order amended to account for their legal interest.[15]

### III.

For the foregoing reasons, the order of the district court is vacated, and we remand for entry of a forfeiture order consistent with this opinion.

*VACATED AND REMANDED*

---

[15]Because we hold that the States, as obligees of the escrow accounts, have not met their burden of proof, we need not decide whether an escrow obligee who did meet this burden would be entitled to receive the present value of its interest or to have the United States maintain the escrow account.